Before we start, I want to welcome Judge Liam O'Grady, who's joining us today for the district judge from Alexandria. We are glad to have you, Judge O'Grady. Thank you very much. I hope you'll lead us to the right result in these cases. Pleased to be here. All right, look here, two guys from South Carolina. What do you know? This is a great way to end the week. All right, let's see, Mr. McKinnon. Yes, sir. Former law clerk to Joe Anderson, former law clerk in Alaska, I believe. Sir, your memory is amazing. And, Your Honor, the clerk's office has told us they had to turn off the mic because of feedback, so if you have any trouble hearing me, please. You do. You're not going to cause any trouble with us hearing you. Good morning, Mr. Chief Judge and members of the court. May it please the court. I represent Cody and Christopher Hearn, who are the sons of the decedent Henry Hearn, who hung himself at Doncaster County Jail on September 13, 2009. Very briefly with the facts. Mr. Hearn was distraught and living behind his ex-wife's house in the woods on a tarp, sort of camping out. There were cans and bottles back there, and he'd been living out there for a few days at least. His wife believed he had been breaking into her home and stealing small items, and so called the police or Lancaster County Sheriff's Department. Deputy Donovan Small responded along with a sergeant, Sergeant Whitaker. They found the campsite. They spoke with Ms. Hearn, the ex-wife, and at the campsite, they found a notepad with a five-page note on it. They read the note. They spoke with Ms. Hearn, but were unable to locate Mr. Hearn at that time. They left. Later in the day, Henry Hearn did show back up in the woods. His ex-wife called 9-1-1 again. This time, Deputy Small responded and did arrest Mr. Hearn for domestic violence. You said that they read the note, but, of course, the police dispute that. Well, they do, Your Honor, but as it's a summary judgment motion, Your Honor, the written report that Deputy Small did at the scene clearly says that he read the note and Sergeant Whitaker read the note. Now, later on in deposition testimony, they try to hedge away from that a little bit, and Deputy Small says we kind of skim through it, and they all kind of qualify it, but the contemporaneous written report clearly says that Deputy Small read the note and Sergeant Whitaker read it as well, and certainly at the summary judgment stage, that would be a disputed issue of material fact, Your Honor. So at this time, they do arrest Mr. Hearn. There is a conversation in the patrol car where Deputy Small claims that he asked Mr. Hearn about the meaning of the note and that Mr. Hearn is dismissive and says not to worry about it. They get to the jail, Deputy Small and his supervisor, Lieutenant Whitaker, who he had consulted with prior to the arrest, look at the note, and again, there is some dispute over in what detail Lieutenant Whitaker looked at the note, but Kirkley looked at the note. Is it your position that Deputy Small is making inquiry about the meaning of the note, that that by itself is not enough to absolve him or others of liability? Absolutely, Your Honor. I believe Your Honor is asking me. I mean this is, mind you, in the context of no knowledge of any prior history of any suicide, which the cases seem to think are important. Well, Your Honor, in some instances the history of suicide would be important, but in this we have the context first, Your Honor, of a man who is clearly disturbed. He is living behind his ex-wife's house on a tarp on the ground in the woods. So he is clearly not in his right mind. She believes he has been breaking into her home. We don't know whether that was true or not, but that was what she told the officers. That was her belief. And on top of that we have a five-page note which has continued references to death. Just really briefly. Well, I don't know if continued is fair, and I think the length of the note may cut against you because there are references to all kinds of things in that note which might have distracted a reasonable observer from what you claim to be the principal gist, that is that he intended to kill himself. He did, Your Honor, but I would ask Your Honor to remember that we don't have to prove this is a suicide note. The standard is deliberate indifference to a known risk. And so long as the note and the context of the note present a known risk of suicide, that's all we have to show. And we certainly concede that it's possible the note could be interpreted differently, but we don't have to. It's a subjective test, and clearly it's been identified as a subjective test, and it's also considered subjective recklessness. So why isn't the judge here required to look at, and the deputies more importantly, look at the overall information that that deputy received, which was very much in conflict, wasn't it? Well, it is a subjective determination, Your Honor, but I don't believe the deputy's testimony is credible. I mean, for example, Deputy Small repeatedly references the note in his written report. He quotes three specific portions from it in his contemporary in his written report. He was clearly concerned about the note, and then two and a half years later in a deposition he minimizes everything. But, of course, even the Farmer Court, the Supreme Court, said you can't just deny an obvious risk. We're allowed to prove by circumstantial evidence that they had knowledge of this risk, and we believe that's the crux of our case, that given the expert testimony, the note, and the circumstances of the note, we're entitled to a jury- Well, but the expert testimony was itself in conflict, so that seems to cut against you as well. If the experts couldn't agree, then why should the deputy be held to a higher standard? Well, I'm not sure. I mean, our experts were not in conflict, Your Honor. Well, that's true, but they had an expert that said to the- and I realize that any conflicts should be resolved against you, but I guess my point is in the context of a conflict amongst experts, you've got an officer on the ground looking at a note for the first time, without any context, no prior history of suicide. I mean, is it fair to say that he had subjective knowledge, actually knew or could not avoid knowing on those facts? Yes, sir. And I said I think that the alternative rule would be that as long as one side in litigation can dig up some expert somewhere that will testify there's no risk, they're off the hook. And that's just- I don't believe that to be the law, Your Honor. And in this case, again, we don't have to show that this was definitely a suicide note. The standard is deliberate indifference to a known risk of harm. Am I correct in my recollection that every time he was asked by somebody whether or not he intended suicide or whether or not he had suicidal thoughts, that he denied it? He did, Your Honor, but as both of our experts said, that is common for someone who's actually made the decision to kill themselves. For someone who's sort of at the crossroads- Well, again, that actually goes to our point, Your Honor, that a deputy is not qualified to make these determinations. If you look at this note, there is a risk of suicide in this note, and all three law enforcement officers, Whitaker, Kirkley, and Small, testified that in their training and the policy at the Lancaster County Jail was if there was any risk of suicide, you did not take the inmate to the jail, you took them straight to the hospital. And so the only way they can justify their actions is by saying, we read this note and there's no risk of suicide. We just don't find that. And that's what they say. They say they either didn't read it or they read it and found nothing concerning in the note. And we just don't find that believable. Now, he's suggesting that we shouldn't look at Small, for instance, and consider the fact that he was a high school graduate and he'd been on the force less than 20 months, I think. Aren't we looking at it subjectively through his eyes as to why he made the decision he made? We are, Your Honor. But again, I think the evidence is he was extraordinarily concerned about the note. I mean, the written report from what was a fairly routine arrest was a page and a half typed with multiple references to the note, including quotations from multiple pages of the note, which shows he clearly read the entire thing. And again, we don't have to prove that he did a mental health assessment and felt this inmate or this detainee was suicidal. Anyone, I think, with a high school education would look at this and say, there's a risk here, and that's all we have to show. I mean, just the reference alone, I don't want my face sunk in. I don't know what... Your Honor, the only thing... The only thing that I could think of, Your Honor, is decomposition, and that's the only thing. I asked the different witnesses at depositions, and one of their medical experts had some crazy theory about a flesh-eating bacteria or something. See, that's the kind of thing that you look at it, I don't even know what that means. So I don't know how we expect a deputy to read that and pick it up as an indicator that he's anticipating his own death. Well, Your Honor, but there are lots of other... I mean, I only have two options, us or this, and then he goes on to say he's tried to contact his ex-wife. He hasn't responded, so this is his only choice. I guess this could be, I'm taking a trip to Vegas or something, but again, the whole picture here is a disturbed man camping out in his ex-wife's backyard in the woods, in the wet, with no toilet facilities, just eating canned food, and then in her belief, sneaking into her house when she's not home. This is a seriously disturbed man, and I would say this note should increase an officer's level of concern. I mean, he gives away his entire worldly possessions, his Elvis picture, $225 and change, which was all the money he had in the world. There was no money he had on him when he was arrested. Is his living in the woods a factor? I believe it is, Your Honor, only because it provides the context to the note. If he was holding down a job as an accountant and up to date on his mortgage and everything, maybe the note is less significant. But for someone who the officers know is living behind their ex-wife's house, clearly still obsessed with his ex-wife, breaking into her home according to her, he's seriously disturbed. Let me ask, do you concede that there's no liability against the sheriff and the county and the jail administrator at this stage after the record? We do, Your Honor, and I should qualify that under the 1983, there's no federal liability. We are pursuing state law claims. How about Snipes, the booking clerk? There's no evidence that she did anything but shake the notebook out before she put it into the records custodian, right? Your Honor, I will absolutely concede that our strongest claims are against Deputy Small and Lieutenant Kirkley. I don't think that I could concede there's no claim against Sergeant Snipes. She says she flipped through the pages. I think that's for a jury to determine whether that's credible or not. I mean, I understand inmates get caught with porno magazines and things like that, and then you're just going to look through them for content. But this is a five-page handwritten note with a map on it. This is not the kind of standard thing that someone gets arrested and has in their possession. And she says that she didn't read it, but I think that we're entitled to have a jury determine whether that's credible or not. It's brought in. I want to make sure I understand the facts. It's brought in with him when he's put into the jail? Yes, sir. She's the booking sergeant and inventorying his personal possessions. What she says is she flipped through it looking for contraband but didn't read it. Was it with any other evidence, or is that the only piece of evidence that comes with him? That is, Your Honor, to the best of my knowledge, the only piece of evidence that comes in with him that would suggest mental distress or suicide. But, I mean, is this the only piece of evidence? Are there other items given to him? Your Honor, I apologize. I know that he did not have any money, because I was going to say that Deputy Small's story that he believed that Mr. Herman was going to take a trip somewhere when he had no cash on him is just not believable, especially when the note references all his cash is at this church with his worldly possessions. Was there a reason ever given, I betray my lack of complete knowledge of the record, but was there a reason ever given for why they pulled that letter out and brought it in? No, sir. It was at his campsite. It was on a legal pad, Your Honor. It was in a notebook bound together, and they found it at the campsite and read it, and they didn't know other than they thought it was evidence. That's all they knew. They thought it was significant. Yes, sir. They certainly never told me they thought it was a suicide note or something. But they never put it in evidence of the crime. They just left it in the Sheriff's Department as a personal property of Mr. Herman's. That's correct, Judge O'Grady. Lieutenant Croakley and Deputy Small actually had a conversation about that issue, whether it was evidence or whether it was personal possessions, and they came to the conclusion it was a personal possession, and so it was booked in. That's my time. I have 10 seconds left. Unless Your Honors have further questions, I'm going to cede it to my opposing counsel. Well, you've got some more time for reply. Thank you, Your Honor. Andy Lindeman, who's been to more Fourth Circuit arguments, I think, than I have. I don't believe a term goes by, Mr. Lindeman. We don't have your smiling face up here and always glad to see you. Always glad to be here, Your Honor. Really? For the most part. Let's don't go too far. For the most part. May it please the Court, my name is Andrew Lindeman. I represent the appellees in this matter. Your Honors, I think the obvious point to start with is that this case needs to be viewed from the viewpoint of a 14th Amendment case rather than negligence case. And in reading the appellant's arguments and reading their brief, what they have really put forward are arguments in support of a negligence claim, relying on such testimonies from Mr. Katsaros, the expert saying any reasonable police officer would believe that that particular note was a suicide note. Well, that's a reasonable person's standard. That's not the standard, obviously, under deliberate indifference, which has been spelled out by the Supreme Court and Farmer v. Brent, obviously. How far do you have to get before you get a triable issue of fact? I mean, you've got a very high standard. We've got this deliberate indifference or subjective recklessness. But here on our record we have, on the one hand we have the note, and on the other hand we have testimony that Mr. Hearns gave to Deputy Small in the discussions that they had. And there seems to be, you've got the report that says I read the note. You've got Small's testimony that I kind of glanced at it, and also Whitaker's directly inconsistent testimony in his deposition as to whether he read the note or not. When do you get to the stage where there is circumstantial evidence that a jury needs to decide under a standard this high? Well, I think one of the important things to look at is what you just said, that the standard is so high. And the key with deliberate indifference, of course, is, and that's what I was trying to focus on a moment ago, is that you look at the subjective recklessness. As the honors indicated, that's what essentially Farmer v. Brennan adopted was the subjective recklessness standard from criminal law. So it requires a two-pronged test, and you have to look at what that particular officer knew, and specifically whether or not then based on what he did with the information, assuming he recognized a substantial risk of harm, whether or not his response, he knew that that was inappropriate. So it is a very high standard. But if there's conflicting evidence as to what he knew, then when is it appropriate for a jury to resolve whether his credibility? Well, obviously, the role of the district judge, and in this particular case, Judge Gergel, is to look at whether or not a reasonable fact finder could conclude otherwise. And based upon his review of the factual information that was presented at summary judgment together with the very high standard of deliberate indifference, Judge Gergel made the determination, which we, of course, suggest to this court was absolutely correct, that the evidence did not rise to the level of allowing a reasonable fact finder to conclude that there was an inference of deliberate indifference. You have to focus in these type of cases on specifically what the particular officer says he knew, but obviously you can look at whether or not there's circumstantial evidence to suggest otherwise. In this particular case, what is very key is their whole case is based around this note. And obviously the note, as Judge Gergel recognized, does not include a specific threat of suicide. And it includes a lot of different information. You know, one of the points that Plants is relying on significantly is the sunken face comment. And I totally agree with the point that Judge Traxor just made. Nobody knows what that means. And in fact, Mr. McKinnon just said it can be interpreted many ways. And he also just conceded a point that I think he has to, because his expert suicidologist conceded it, that that note as a whole can be interpreted many different ways. So obviously if it's not clear cut and it can be interpreted many ways, where is the circumstantial evidence that would suggest that when Officer Small testifies that I didn't read that as a suicide note, I didn't take it that way. I was curious about it. And of course then he follows up and specifically asks Mr. Hearn, who he found to be calm and coherent and of appropriate demeanor. He asked him what it was about, and Mr. Hearn then provided him with a very cogent explanation for the note. Mr. McKinnon put some substantial import on the fact that your client, Deputy Snipes, tried to run away from how much of the note he actually read in his deposition testimony. That's obviously relevant, right?  that if he was trying to minimize that aspect of the facts that in fact he did know and now is trying to avoid that knowledge. Well, I think really what the appellant's argument is along those lines is they're trying to compare his deposition testimony to what was actually included in the note, meaning the report that he did, which is at page 274 and 275 of the record. And that's not a fair comparison based upon the way it's been argued because really if you take a close look at the officer's typewritten report, he doesn't, contrary to what I believe I understood Mr. McKinnon, it is, I'm sorry, 275 and 276 of the record. And if you look at page 275 of the record, the first page of that particular report, I disagree with Mr. McKinnon. He doesn't quote verbatim any portions, at least I don't see it in here, and maybe I'm mistaken, but I don't see any word-for-word quotes from the note. About three-fourths of the way down, he says, Deputy D. Small also noticed a yellow notepad that was lying on the sheet. Deputy D. Small read the notepad, which was written to D. Hearn from H. Hearn. H. Hearn had stated where his other belongings were and that winter was coming, and he did not know what else to do. The letter also stated for D. Hearn to go get his belongings, that he was saying goodbye and that he loved D. Hearns and Daisy, who was his daughter. That's the extent of his description of what the note says. So it doesn't actually show that he read the entire note because it's certainly not necessarily a summary of all four pages of that particular note, and it certainly doesn't give any quotations. I think that is very consistent with Officer Small's subsequent deposition testimony. We're supposed to read the words, Deputy D. Small read the notepad, meaning that he read just a little bit of it, and it's consistent with his deposition? Well, he certainly doesn't state here, give the – and my point being that what the argument that the appellants have made is they've suggested that his deposition testimony is inconsistent because his note went into great detail, and the point that I'm trying to make is his note didn't go into great detail. Yes, it says I read the note, but even if you assume that that's true, it's what did he get from the note, did he interpret that note as a suicide note, and he says he didn't. There's no evidence to suggest that he's not being candid about that. In addition to that, as I've already touched on, the note does not include a specific threat of suicide. I think that's undisputed. That was found by Judge Gergel. And the plaintiff's own suicidologist expert says it's subject to interpretation, something that Mr. McKinnon has just conceded here today. What did he do with the fact that he was legally intoxicated at the time that they arrested him? Well, that, of course, didn't come out until, and that's not in this particular record. I do not believe that there are medical records in this record. I might be mistaken about that, but going through it last night, I don't believe I saw that. Now, I think the only reference is actually in the appellant's brief. Right. And bottom line, that was not a significant issue. They raised that in their brief discussion of Sergeant Snipes, saying that she must have been deliberately indifferent because in addition to not reading the note or digesting the note, even though her testimony was she just flipped through it looking for contraband, but in addition to that, that he was intoxicated. There's no evidence that the officers found him to be intoxicated, and I don't believe that this summary judgment record includes the level of intoxication, assuming that he is, even though I may have missed that, but I don't believe that's in there. And I know where they've cited it in their brief. They have not cited it to the record because I just noted that this morning. Deputy Small did ask Mr. Hearn whether he had any thoughts about harming himself. Well, he asked what was the explanation for the note. I mean, he was just curious about that. And, of course, that in our judgment shows that he wasn't deliberately indifferent. But he was not the one who asked directly whether he had any thoughts of suicide? I don't believe he asked those questions. I think he asked for an explanation of the note. It was Sergeant Snipes as part of the intake process. She did a medical questionnaire, and one of the questions that's asked is whether or not the inmate or the perspective of the detainee is thinking about hurting himself or has any type of suicidal ideation. Well, if, in fact, Smalls had no inclination to believe that Mr. Hearn was going to hurt himself, then why ask about the substance of the note? Why would it matter? I'm sorry? Why would the question matter? Why would he ask about what the note meant unless he thought, perhaps, that there was some thought about hurting himself? Well, his explanation, he was curious what it meant. I mean, that he just wanted to make certain that there wasn't anything unusual going on. You know, another important point, and obviously in Mr. Small's favor, and I don't believe that we touched on this in our brief, and I certainly want to call it to the Court's attention, that Mr. Small was also asked when Hearn was being brought in, he asked Small to go back and get his property. And I think that's significant. The man was asking to safeguard his property. If he intended to go through with the suicide as spelled out in the note, as they're suggesting that the note says, he wouldn't have cared what happened to his particular property, but he was asked for that to be safeguarded. So that's something that Small was asked, which would tend to be inconsistent with anything or the suggestion that's made that the note says. Because the note, according to the appellants, they've interpreted that to say that he was essentially giving his property away sort of as a last will and testament in certain respects. In addition to the statements about having his face sunk in, and I guess reasonable minds can differ as to what that meant, he had a list of songs at the end of the note, some of which might have suggested that he was not going to be long for this world. Well, I think, again, we have very much the benefit of hindsight in this case, and I think Judge Gergel, obviously, the standard, and I think the Parrish v. Cleveland case gives this Court a very good road map as to how to apply that. And obviously you can't look at it with hindsight. Now, if you look at the note and try to look at it without hindsight, he doesn't say, at my funeral I want these songs played. He just says, I like these songs. Now, what does that mean? Certainly we all know now with the benefit of hindsight that what he was probably suggesting is he was planning out his funeral. But at least maybe that's certainly a reasonable suggestion, but with the benefit of hindsight. It doesn't say that. It just says, I like these songs. They weren't the typical songs. I mean, I disagree with the appellants. I don't know that they're the typical songs that are played at a funeral. But, again, that's all subject to interpretation. This is a subjective standard here, and you have to look at what these particular officers knew. And, of course, as this Court has already touched on, you've got four different appellees in this particular case, and the issues are somewhat different for each of them. I don't think there should be any question in this Court's mind that Sergeant Whitaker, the summary judgment for him was appropriate. Even if he read the note the first time it was found at the campsite, it is without dispute that he had no involvement whatsoever with Mr. Hearn. Mr. Hearn was not at the campsite at that particular point. Did the officers know when the note had been written? They did not. I don't believe that that was ever clear to them or were they questioned about that. It was simply found on a yellow notepad, and I don't think it was. I'm pretty certain it wasn't, if I recall the note. And the other notes that they found, subsequently none of the deputies had looked at before the suicide occurred. Is that right? That's correct. And Deputy Whitaker became the supervisor over the detention center at some stage. And was there any information in the record that he knew that Hearns had been arrested and was in the detention facility before he hung himself when he was the supervisor? I don't, and I don't recall him, and I apologize to you, I don't recall him being a supervisor. That may be Kerkley. Yeah, Kerkley was the supervisor. Did Whitaker take over for Kerkley after Hearns had been brought in? I think actually at the point, see Whitaker's only involvement was early that morning, the first time to the campsite. And Whitaker, while they were at the campsite, got called to another scene. That was the end of his involvement. He had no further involvement with either the arrest, the transport, or the incarceration. And I think the evidence is uncontroverted on that. Let me make one additional point. Mr. McKinnon said several times in his opening that the fact that Mr. Hearns was homeless, essentially homeless, living in the woods, should have suggested somehow to these officers that he was mentally unstable or deranged in some way. And I don't think that's a fair assessment. I mean, unfortunately in society today we have a lot of homeless people. The simple fact, many homeless more than likely do have mental illness, but many do not. I don't think you can simply make that jump because this man was living in the woods. Well, I think his point is that it paints a mosaic that, in addition to the other facts, may be enough to show subjective knowledge. So is it your view that absent an explicit threat of suicide, there's just no way ever for an officer to be on actual notice and have subjective knowledge of a threat of suicide? Well, that certainly was what this court found in Gordon v. Kidd. They said there needs to be some sort of prior suicidal tendency, suicidal history, that detention officers need to be on notice of some particular history in order to be held ultimately liable for deliberate indifference. So that's the standard this court set. Is that by Farmer? You know, I think it does. Certainly parts of Gordon does not because Gordon also expresses a reasonable man standard and suggested that something less than subjective recklessness in the criminal sense would be sufficient to give rise to liability. But I think that's the only part of Gordon that is probably no longer good law. But certainly how you approach and what you look for as far as a history, I think those aspects, and we rely on Gordon, and I think Judge Gergel actually cited Gordon as well for those premises. But obviously Farmer v. Brennan governs, and this court has a wealth of case law after Farmer v. Brennan. Again, one of the best cases I think was written by former Chief Judge Williams, who obviously we miss greatly in South Carolina, and I'm sure this court does. I know this court does as well. But that is an excellent opinion, and that's one that I believe really set the framework that this court can follow and has followed in a substantial number of cases since then in both suicide and any type of deliberate indifference cases in a jail or prison setting. And that decision from this court really spells out what I think is probably the prime issue that the appellants have argued here, and that is whether or not the note itself was obvious enough, provided such an obvious risk of harm that it doesn't matter what the officers say, they subjectively knew. And that issue is actually rejected in the Parrish case, and I would submit that the reasoning in that particular case should apply here as well. And I think the facts actually in this case, as I've indicated, are actually stronger because there have been concessions that this note can be interpreted different ways. And certainly the plaintiff's own expert has said that, which I think is a key point. As my time is running out, I do want to deal with one. We've raised qualified immunity, of course, as an additional sustaining ground. That issue was raised below by footnote. Judge Gergel indicated that he did not need to reach the issue. But we would submit to this court that even if you find that there may be an issue of fact and dispute with one or more of these officers, and I certainly, as I said before, I think the cases are clear-cut with Whitaker and Snipes. Kerkley may be a little closer, and Small may be a little closer, but I think the case that the plaintiffs have made as far as those two officers are more on the lines of negligence rather than deliberate indifference, which obviously is a claim that they still have pending, having been remanded. But assuming this court finds that there's an issue of fact and dispute as far as the 14th Amendment claim is concerned, we would reassert our entitlement to qualified immunity. And I think the strongest argument on qualified immunity is the simple fact that you've got a district court judge who has examined these facts, looked at them closely, and has made the determination that he doesn't believe that the conduct that has been alleged and taken in a light most favorable to the plaintiffs gives rise to deliberate indifference. And, you know, obviously there's case law from the United States Supreme Court and a wealth of case law from this court that says if two jurists disagree, you know, based upon and aren't on the front lines and having to decide things on the spur of the moment, but obviously after reviewing the facts, reviewing legal arguments, reviewing briefs, and make the determination that where one judge says there's a constitutional deprivation and another judge suggests that there may not be, well that's classic evidence or classic proof that the officer should be entitled to qualified immunity. So the simple fact that Judge Gergel has looked at this and has concluded that these facts taken in a light most favorable to the plaintiff do not give rise to deliberate indifference, even should this court disagree, we would suggest that these officers are entitled at the very least to qualified immunity. I see my time is running out. Unless there are any other questions, we would ask that the court affirm the lower court. And I thank you very much for your time. Thank you, Mr. Lederman. Mr. McKinnon. Thank you, Your Honors. Your Honors, if I could just turn really briefly to Deputy Small's report. What page? This would be, oh, it's actually in two places in the record, Your Honor. One is at 135, and I believe Your Honors are looking at it later in the record. It shows up again. But 135 is about way through, Your Honors. And about two-thirds of the way down the page, he says, as Judge O'Grady mentioned, he clearly says he read the notepad. And, of course, he backs off in his deposition, and as Judge Diaz picks up, that is evidence from which the jury can infer he's trying to get out of a claim. He's backing off what he said earlier to defend himself in a lawsuit. It goes to his credibility. But then going right after that, he goes on to quote from the note. He says he stated where his other belongings were. That's from page two of the note, which means he read page two. Then he says winter was coming. That's a direct quote from the note. That's from the first page of the note. And then he goes on. He tells Hearn to get his belongings back to page two and three. And then goodbye, and then he loved Darcy and Daisy, his ex-wife and daughter. That's from pages three and four of the note. So he's both quoting the note, and he's referencing the entire note. So his later testimony that he just skimmed it is simply not credible. And I also ask if Your Honors wouldn't mind turning with me to page 113 of the record. This is from Deputy Small's deposition testimony. And as Judge Diaz picked up on in his questioning, he was clearly concerned. I asked him at the top of the page 113, I said, what did you ask him about the note? And Deputy Small said, I asked him, hey, are you okay? That is a deputy who is concerned about this man's welfare. And then he goes on, and I asked him, I said, well, why did you ask him about the note? And he doesn't answer me. He has no explanation for that. At the end of the page, he goes on to say he wasn't concerned about the note at all. Well, you're skipping the part where he says he was leaving and going out west and telling his wife and family goodbye. I did, Your Honor, but my question there is, why did you ask him about the note? And he gives me this, what I would say is a nonsense story about moving out west. I mean, he has not explained why he's concerned about the note. Even if we believe him that he really did hear this message about going out west from Mr. Hearn. He does not explain. He claims he was not concerned about Mr. Hearn. He was coherent. Everything was fine. Nothing worried him. Yet he quoted the note multiple times in his report, and even in his deposition he admits he asked him, are you okay? This is not consistent with a law enforcement officer who's not concerned about his welfare. Well, before that, though, in the deposition on 112, you were asking about the conversation as they were on the way to the detention center, and he more fully explains that Hearns had told him that he did it for a living, he worked on oil rigs off the coast of Florida, made a good living at it, got slack, and he moved back there, and it was a casual conversation like me and you speaking. Doesn't that more fully flush out the nature of the conversation that he had? It does, Your Honor, but, again, I think it's important to remember that Deputy Small testified he has no psychiatric training, no mental health training. He is totally unqualified to make an assessment. So if he has any concern, there's only one course of action. It's a flow chart. Are you concerned this inmate is going to commit suicide? If there's a concern, not a certainty, but if there's a risk, if there's a concern, they go to the hospital and not the jail. He, I mean, maybe a psychiatrist could ask these kind of questions and say, his affect was calm, he was pleasant, he discussed his job with me, and I made an assessment that he wasn't a suicide risk. Deputy Small can't do that. His only job is if there is a risk of suicide, which we submit there clearly was, there was a risk, not a certainty, and that's what our expert conceded. You can't read the note and say with 100% this man is going to kill himself, but it is clear there is a significant risk to someone who wrote that note, especially someone who's not just homeless, but living on a sheet behind his ex-wife's house and breaking in to steal knick-knacks. If he was to be taken to a hospital, was it the Lancaster Hospital or the State Hospital in Columbia? They said the emergency room, Your Honor, which I took to mean the regular hospital in Lancaster. So he's not qualified to make assessments or say, you know, I'm satisfied based on these answers there's no risk. If there's any risk that all three of them say, Whitaker, Smalls, and Kirkley, immediately to the ER. And that's, they didn't do that, and they're not qualified to make an assessment or decide based on a conversation that there's no risk. A couple of other points, Your Honor. I thought the question about Gordon and Farmer was a great one. Farmer clearly said you can have circumstantial proof of knowledge, and that, in my opinion, gets rid of Gordon. I mean, that's, it is a subjective standard, but the standard of subjective knowledge is subject to circumstantial proof under Farmer, and that's what we have in this case. We have the fact that the details, the detailed commentary about the note, the concern in the conversations, and just the fact that we believe the jury's entitled to look at the note and make their own decision, do they believe these officers' testimony. Let me ask you, did Judge Gergel parse out in his order the distinction that you made between a risk of suicide and actual suicide? He did not, Your Honor. So that's your problem with that order? That's one of my problems, Your Honor. And again, Judge Gergel didn't give us argument in that, Your Honor. He decided it on the brief, so that was the point. I would have made an oral argument but was not given the opportunity. A couple of other quick points, Your Honors. As far as qualified immunity, my colleague made an argument, you know, jurists can disagree, what about these poor officers on the street. But what I would respond to that, Your Honors, is they didn't disagree on the law. No one disagrees on the law in this case. The question is, is there evidence supporting the fact that these deputies had knowledge of the risk. That's purely an evidentiary standard, and Wilson doesn't apply. It's not an uncertain constitutional right. It's well established in the Fourth Circuit that pretrial detainees have a right to be protected from a risk of suicide. There's no question on that law. And if there was a risk, the officers had to act on it. Well, I guess the point was that he's looking at Saucier versus Katz in the first prong and saying, is there a violation of a constitutional right? And that's a factual inquiry, and if the court came down the other way, how could the officers recognize the constitutional violation, right? Well, yes, sir, but I would say that the question in that regard is, is it a violation of the Constitution to be deliberately indifferent to the risk of suicide? The answer is unquestionably yes. And then Judge Gergel's order basically says there is no evidence that these officers were aware of the risk of suicide. That's a sufficiency of evidence decision that I think would not be on their side as far as qualifying immunity. Yes, sir. And I would again say I'm not saying that a jury could not find against us, but my belief is that we should have been able to submit this case to a jury. There is at least an issue of material fact. Thank you, Mr. McKinnon. Thank you, Your Honor. I would like to come down and shake your hand, but I've got some kind of bug.
judges: William B. Traxler, Jr., Albert Diaz, Liam O'Grady